35 F.3d 567
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Calvin Otis TANKSLEY, Defendant-Appellant.
 No. 93-6346.
 United States Court of Appeals, Sixth Circuit.
 Sept. 14, 1994.
 
 Before: GUY and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Calvin Otis Tanksley appeals his jury conviction for wire fraud, in violation of 18 U.S.C. Secs. 2 and 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. Sec. 371. He was sentenced to 30 months' imprisonment and three years of supervised release. Tanksley appeals two rulings by the district court limiting his questioning of two witnesses at trial. Because the district court did not abuse its discretion in making these rulings, we affirm Tanksley's conviction.
 
 
 2
 * The basis for Tanksley's conviction was the unauthorized use of security codes and "Comcheks" to obtain cash. Comdata Network, Inc., a Tennessee company, provides money to truck drivers while they are on the road through the use of its Comcheks. Comdata issues a "security password" to a subscribing trucking company. When a company needs to transfer money to a driver, it contacts Comdata, identifies itself using the password, and authorizes the particular transfer of funds. Comdata then issues an "electronic express code" and authorization to transfer the money. The company tells the driver the code and amount of money authorized. The driver picks up Comcheks at participating businesses (usually truck stops); fills in the code, amount, and payee (usually the driver); activates the Comchek by contacting Comdata and providing the serial number of the Comchek, the code number, and the amount; and then cashes the Comchek, which is treated like a personal check. The merchant cashing the check must first call Comdata to obtain authorization, to confirm that the check has been activated, before cashing the check.
 
 
 3
 An investigation into fraud at Comdata led to Nicole Ferguson, a Comdata telephone service representative who had access to the codes (she took calls from the drivers, processed the codes given to her by them, and gave authorizations). Ferguson confessed that she stole Comdata information and gave the information to Tanksley, who used it to cash two Comcheks at the Lebanon, Tennessee, Minit Mart. Ferguson had also cashed some Comcheks herself. Ferguson and Tanksley were romantically involved at the time.
 
 
 4
 Tanksley also gave information he received from Ferguson to Vickie Shahin, who used it to cash Comcheks. Shahin testified that Tanksley told her that he had received the information from "Nicki" at Comdata. The money received from cashing the checks was split between Tanksley, Ferguson, and Shahin, although Ferguson and Shahin both testified that they had never met.
 
 
 5
 Special F.B.I. Agent Pat Wilson interviewed Shahin and told her that Tanksley had confessed and implicated her, when, in fact, Tanksley had not confessed. Shahin then confessed and implicated Tanksley in the wire fraud. She was later told that Tanksley had not confessed, but she apparently did not believe that, because at trial she said that Wilson knew too many facts that no one except Tanksley would know.
 
 
 6
 Roger Johnson, an employee at the Minit Mart, identified Tanksley in a photo line-up and in court. Johnson testified that he remembered Tanksley cashing Comcheks on two occasions in August 1992, and that on one of those occasions Ferguson was with him. (Johnson and Ferguson had known each other previously.) Tammy Ruth Pickle, Shahin's sister, testified that she saw Tanksley fill out Comcheks and give them to Shahin, who would cash them. Pickle testified that Tanksley told her that Ferguson gave him the codes. Pickle said that she saw him make a phone call regarding the codes. She stated that he would fill the checks out, give them to Shahin, and Shahin would return the money from the cashed checks to him.
 
 
 7
 Shahin and Ferguson each pleaded guilty to one count of conspiracy to commit wire fraud. Shahin and Ferguson testified that they did not know each other, but that they did know of each other.
 
 
 8
 At trial, Tanksley's brother, testifying for Tanksley, stated that he saw Ferguson and Shahin together playing a game with a ball outside a Nashville bar. Tanksley proffered the brother's testimony that he saw the two women that same night snorting a white powder together inside the bar. At a bench conference, the district court disallowed the question to be asked in front of the jury.
 
 
 9
 Tanksley also sought to cross-examine Shahin about an alleged mental condition that would affect her ability to discern the difference between truth and fantasy. The district court disallowed that line of questioning as well.
 
 
 10
 Tanksley did not challenge the two rulings at trial, but raised them in his post-trial motion for judgment of acquittal or for a new trial. The district court denied the motion. The district court concluded that the question regarding Shahin and Ferguson snorting powder at the bar "was too remote and speculative with respect to establishing any relationship, and thus irrelevant." As to Shahin's prior psychiatric diagnosis, the district court affirmed its ruling during the trial that the issue could have been explored pre-trial,[1] but "it would be too speculative to raise at trial."
 
 II
 
 11
 Tanksley contends that he was denied a fair trial because the district court's two rulings prohibited him from inquiring into his brother's alleged observation of Shahin and Ferguson snorting a powder and into Shahin's mental condition. We uphold the district court's evidentiary rulings absent a clear abuse of discretion. United States v. Taplin, 954 F.2d 1256, 1258 (6th Cir.1992). We note that the district court is generally granted wide latitude in making evidentiary rulings. See United States v. Blakeney, 942 F.2d 1001, 1022 (6th Cir.1991), cert. denied, 112 S.Ct. 881 (1992). Because Tanksley failed to make timely objections to the district court's rulings, stating the specific grounds for his objections, our review is limited to "plain error" that affects Tanksley's "substantial rights." Fed.R.Evid. 103(d); United States v. Levy, 904 F.2d 1026, 1030 (6th Cir.1990), cert. denied, 498 U.S. 1091, 111 S.Ct. 974 (1991).
 
 
 12
 * Tanksley contends that the Government's theory of the case was that Tanksley was a necessary member of the conspiracy because Ferguson and Shahin did not know each other. The testimony of Tanksley's brother, he says, clearly would have undercut this theory by showing that the two women "knew each other well enough to snort a white powder together." Tanksley offers the evidence "not to show prior bad acts by government witnesses, [but] to show that they had lied to the jury about a material issue in the case." At oral argument, Tanksley's counsel emphasized that the key piece of information was that the two women were doing something "intimate" together at the bar. Counsel conceded that he made very little effort at trial to clarify this position to the district judge.
 
 
 13
 We hold that the district court did not abuse its discretion in excluding the testimony of Tanksley's brother regarding the conduct of the two women at the bar. Under Fed.R.Evid. 608(b):
 
 
 14
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness'[s] character for truthfulness or untruthfulness....
 
 
 15
 Evidence of prior drug use generally is not relevant to the issue of truthfulness under Rule 608. See United States v. Sellers, 906 F.2d 597, 602 (11th Cir.1990). Further, Tanksley was allowed to ask if his brother saw Ferguson and Shahin together that evening. The brother testified that he saw them outside the bar "playing some kind of ball, and they were both out there then." Because Tanksley was able, with this testimony, to put before the jury the possibility that the two women knew each other, it is unlikely that any "substantial right" of Tanksley's was affected by the district court's ruling regarding the powder snorting. See Fed.R.Evid. 103(a) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."). Also, Tanksley made no effort to rephrase or to reduce the proffer to retain the imputation of acquaintence, without touching on the obviously prejudicial allegation of drug use. Thus, we can find no clearly erroneous factual finding or misapprehension of the law upon which the district court based its decision. Therefore, the district court's rejection of the testimony as too remote or speculative was not an abuse of discretion. See Taplin, 954 F.2d at 1258; Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 479 (6th Cir.1987).
 
 B
 
 16
 Tanksley also argues that Shahin's alleged mental problem affected her ability to tell the difference between truth and fantasy, and that the district court's exclusion of that evidence "very likely" affected the jury's decision in this case. He says that evidence of Shahin's psychiatric condition supports his defense that he "was the subject of a vendetta by a former lover and her sick friend." Combined with the other ruling at issue here, he asserts, this ruling denied him a fair trial.
 
 
 17
 Tanksley offers little law or argument as to how the district court's ruling on this matter was an abuse of discretion. Tanksley never explained, either at the time he sought to question Shahin or in his post-trial motion for a new trial, what the "prior psychiatric diagnosis" was or what were the underlying facts of the alleged condition. Tanksley's counsel merely told the district court that he had "been informed" of "a psychiatric diagnosis that affects her ability to tell the truth." Where a ruling excludes evidence, "the substance of the evidence [must also be] made known to the court by offer or [be] apparent from the context within which questions were asked." Fed.R.Evid. 103(a)(2). Given the absence of factual support for Tanksley's claim, the district court did not abuse its discretion in declining to allow this line of questioning, nor is it likely that any of Tanksley's "substantial rights" were affected.
 
 
 18
 In his brief, Tanksley does cite one case in which the district court's denial of the defendant's attempt to question the government's witness about her alleged mental instability was reversed on appeal. In that case, United States v. Lindstrom, 698 F.2d 1154 (11th Cir.1983), however, the witness was the star witness and the defense made a substantial offer of proof regarding the witness's mental illness. The defense there tendered public records and psychiatric records showing, among other things, (1) the witness's hospitalization following a serious suicide attempt, (2) an offer of money to murder the wife of the witness's alleged lover, (3) an involuntary institutional commitment after overdosing on drugs, (4) an arrest for assault for firing a gun through the window of her alleged lover's house, (5) involuntary commitment after that arrest, and (6) a diagnosis of schizophrenic reaction. Id. at 1161-62. On the facts of Tanksley's case, in which Tanksley offers no factual support for his claim, Lindstrom is distinguishable. See United States v. Butt, 955 F.2d 77, 82-83 (1st Cir.1992) (informally diagnosed depression or personality defect insufficient for appellate court to reverse trial court's decision not to allow defendant access to witness's psychiatric records or to cross-examine witness about same; mental instability is relevant to credibility only where witness exhibited "a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth"); United States v. Antone, 981 F.2d 1059, 1061-62 (9th Cir.1992) (not abuse of discretion to deny motion to compel production of psychiatric records of witness-victim where no evidence of serious mental illness on the part of witness-victim). Thus, Lindstrom does not provide a basis for reversing the district court's ruling.
 
 III
 
 19
 The judgment of conviction is AFFIRMED.
 
 
 
 [1]
 The district court did not explain the method by which this issue could have been explored pre-trial