UNITED STATES of America,

v.

Stephen J. MAZZOLA Christina Svendsen Sebastian Mazzola James S. Konaxis Anthony D. Marek, and Frank V. Messina, Jr.

No. CRIM. 01–10012–RGS.

United States District Court,
D. Massachusetts.

Aug. 6, 2003.

See also 2002 WL 511518.

Edward R. Gargiulo, Gargiulo, Rudnick &
Gargiulo, John H. Bee, Gargiulo, Rudnick &
Gargiulo, Laura M. Roffo, Butters, Brazilian
& Small, Thomas J. Butters, Butters, Brazil-
ian & Small, L.L.P., Conway T. Dodge, Jr.,
Rubin & Rudman, Gary C. Crossen, Rubin &
Rudman LLP, Richard C. Bardi, Law Office
of Daniel J. O'Connell III, Daniel J. O'Con-
nell, III, O'Connell & Pollenz, Walter H.
Underhill, Boston, MA, Martin D. Boudreau,
Milton, MA, Walter H. Underhill, Boston,
MA, for Defendants.

Victor A. Wild, United States Attorney's
Office, Boston, MA, for U.S.

**MEMORANDUM AND ORDER RE: DE-
FENDANT STEPHEN MAZZOLA'S
MOTION TO DETERMINE COMPLI-
ANCE WITH THIS COURT'S ORDER
DATED SEPTEMBER 3, 2002
(DOCKET ENTRY # 123); DEFEN-
DANT STEPHEN MAZZOLA'S MO-
TION FOR RECONSIDERATION OF
THIS COURT'S ORDER DATED
SEPTEMBER 3, 2002 RELATIVE TO
DISCLOSURE OF MEDICAL REC-
ORDS *(DOCKET ENTRY # 128)***

BOWLER, Chief United States Magistrate
Judge.

Defendant Stephen J. Mazzola seeks re-
consideration of this court's September 3,
2002 Order allowing limited disclosure of the
medical records of Joseph Mazzola ("Mazzo-
la"), a key government witness as well as the
sister of defendant Christina Svendsen and
the son of defendant Sebastian Mazzola.
(Docket Entry # 128). In particular, defen-
dant Stephen J. Mazzola asks this court to
provide his counsel with complete access to
the medical records subject to any protective
order deemed appropriate and, in the event
this court does not allow complete disclosure,
order that the medical records be made part
of the record.[1]

Defendant Stephen J. Mazzola additionally
complains that the September 3, 2002 Order
was too limited and, "Accordingly, the court
order should be broadened to require the
disclosure of all exculpatory material and
impeachment evidence within the medical,

---

1. Inasmuch as the government has no objection
to the latter request provided that the records
remain sealed, the request is allowed subject to
the records being placed under seal.

psychiatric and counseling records." (Docket Entry # 128, p. 6). Although counsel for defendant Stephen J. Mazzola is not entitled to complete access, which includes irrelevant and immaterial private matters covering time periods not germane to the charges in the Indictment, defense counsel is entitled to all exculpatory material and impeachment evidence in the medical records. For reasons stated below, the September 3, 2002 Order is broadened to provide counsel for defendant Stephen J. Mazzola with additional disclosures.

This court's review of the redacted disclosures submitted by the government in conjunction with defendant Stephen J. Mazzola's motion to determine compliance (Docket Entry # 123) also remains outstanding. For reasons stated below, this court orders further disclosure of certain documents relative to Joseph Mazzola's familial relationship with his mother, his mental stability resulting from difficulties with his wife and the severity of his psychological problems as shown in R–12 and 13.

### BACKGROUND

The September 3, 2002 Order allowed a motion to compel filed by defendant Stephen J. Mazzola (Docket Entry # 104) and corresponding requests for disclosure filed by other defendants (Docket Entry ## 100, 103 & 107) to the extent of ordering the government to disclose those portions of the medical records of Joseph Mazzola that "reveal: (1) any use of drugs, including but not limited to, Percocet and Vicodin; and/or (2) any relationship with his father." (Docket Entry # 115).

Defendants' joint reply to the government's response to the motion to compel had requested, "[i]n the alternative, . . . the information contained in Mazzola's treatment records relevant to their cross-examination of

Mazzola regarding his allegations of abuse[2] and his drug dependency." (Docket Entry # 107). Accordingly, this court centered its initial in camera review of the medical records on these two areas and ordered production relative to these areas. In October 2002, the government produced approximately 230 pages of the medical records in response to the September 3, 2002 Order.

In February 2003, defendant Stephen J. Mazzola filed the motion to determine the government's compliance with the September 3, 2002 Order. (Docket Entry # 123). At the March 20, 2003 hearing on the motion to determine compliance, this court instructed the parties to meet and confer relative to certain disputed documents that the government previously produced in redacted form. This court also directed the government to thereafter submit the redacted and the original documents to this court for in camera review. As a result of the government's further review of the medical records, the government made additional disclosures regarding four of the 21 disputed documents. On May 15, 2003, the government submitted the redacted and original documents for in camera review.[3]

On May 20, 2003, counsel for defendants Stephen J. and Sebastian Mazzola addressed this court. Both argued that the limited production would hamper their ability to effectively cross examine Joseph Mazzola and that only they had the expertise to determine what was relevant in the medical records to their clients. Counsel for defendant Stephen J. Mazzola pointed to an overlooked reference to gambling in a June 7, 1999 progress note in the records from Habit Management Institute.[4] He also posited the option of restricting disclosure to counsel. Counsel for defendant Sebastian Mazzola pointed out that Joseph Mazzola, who was alleging abuse at the hands of his client, was also being

---

2. The pertinent filings focused on the abuse suffered by Joseph Mazzola at the hands of his father.

3. The docket sheet incorrectly references the date as May 27, 2003.

4. The argument that only defendants have the necessary expertise is misguided. Because the

first in camera review focused on defendants' alternative request to disclose information regarding Joseph Mazzola's abuse from his father and drug dependency, this court did not order production of the gambling reference.

The counselor submitted a letter stating that Joseph Mazzola did not have a gambling addiction. (Docket Entry # 129, Attached Letter).

abused by his wife, according to the June 7, 1999 progress note.[5]

The government reasserted its position that the medical records contained private and personal matters and that Joseph Mazzola's difficulties with family members had no bearing on the proceedings. To the contrary, however, Joseph Mazzola's difficulties with his wife as well as with other family members bears upon his mental stability and consequent ability to recall events and testify accurately. It also gives important context to his familial relationships inasmuch as he will be testifying as a key government witness against his father, brother and sister. References in the medical records regarding Joseph Mazzola's relationship with his brother (defendant Stephen J. Mazzola) and sister (defendant Christina Svendsen) particularly during the time period covered by the Indictment are likewise relevant to Joseph Mazzola's credibility. Although less forceful, the parallel nature of suffering perceived abuse from other family members bears upon the believability of Joseph Mazzola's alleged bias due to his perceived abuse from his father. Joseph Mazzola's relationships with other family members, such as his mother, also bear upon his credibility and motives for testifying against his father, brother and sister. On a broader level, Joseph Mazzola's relationships with his family members adds context or evidences a perceived pattern of abuse which bears upon his bias toward familial co-defendants.

At the close of the May 20, 2003 hearing, this court directed defendant Stephen J. Mazzola to file a written motion and advised the other defendants that they could join in such a motion. On June 20, 2003, defendant Stephen J. Mazzola filed the written motion.[6] Therein, he urges that records relative to counseling about Joseph Mazzola's financial problems is both exculpatory and impeachment evidence. The government filed a response to the motion for reconsideration on June 30, 2003. (Docket Entry # 129).

Finally, this court deemed it prudent to conduct a further review of the entire medical record in light of the allegations that the previous in camera review was inadequate, the limited perspective this court afforded the review given the allegations in defendants' reply brief, and the request to broaden the September 3, 2002 Order to include all exculpatory material and impeachment evidence. Accordingly, this court issued a Procedural Order directing the government to submit the medical records in camera. The government submitted the medical records on July 28, 2003. The motion to reconsider (Docket Entry # 128) and the in camera submission relative to the motion to determine compliance (Docket Entry # 123) are therefore ripe for review.

## DISCUSSION

The September 3, 2002 Order describes the medical records, the charges in the Indictment, including the relevant time period, and provides additional procedural history. (Docket Entry # 115, pp. 1–4). It also discusses the psychotherapist-patient privilege under federal common law, albeit not the Constitution, and the government's affirmative duty to disclose material documents in its possession under Rule 16(a)(1)(C), Fed. R.Crim.P., and exculpatory evidence pertaining to impeachment. (Docket Entry # 115, pp. 4–11).

The Order found that defendants had a right to access the medical records pertaining to Joseph Mazzola's mental instability under both *Brady* and Rule 16(a)(1)(C), Fed. R.Crim.P. (Docket Entry # 115, pp. 6–7 & 11). It also concluded that defendants had a right to access the medical records pertaining to Joseph Mazzola's relationship with his father, a defendant in this case with whom Joseph Mazzola had a history of perceived

---

5. Counsel for Sebastian Mazzola therefore impliedly argued that such parallel abuse was relevant to his cross examination of Joseph Mazzola. This court agrees inasmuch as it goes to the believability of the bias Joseph Mazzola has against his father resulting from the alleged abuse.

6. Because no other defendant joined in the motion, this court will limit disclosure of the additional medical records to counsel for defendant Stephen J. Mazzola. Other defendants wishing access to the material should file a brief written motion asking to join in the motion for reconsideration *nunc pro tunc*.

abuse. (Docket Entry # 115, pp. 7 & 11). In addition, this court rejected and continues to reject the government's premature position that defendants' ability to cross examine Joseph Mazzola cures any denial of access to the medical records. (Docket Entry # 115, pp. 6–7). On reconsideration of the Order, all of the foregoing matters remain correct.

■ Although the Order accurately discussed the psychotherapist privilege under federal common law, Rule 501, F.R.E. ("Rule 501"), and the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (Docket Entry # 115, pp. 7–9), the Order did not determine the applicability of the federal common law privilege to this case. Instead, this court assumed *arguendo* that the privilege would apply. (Docket Entry # 115, p. 9). Upon reconsideration, this court finds that a federal common law privilege should not be recognized or applied in the case at bar.

The Supreme Court in *Jaffee*, a civil proceeding, recognized a psychotherapist privilege under Rule 501 under federal common law applicable to confidential communications made to licensed psychiatrists, psychologists and social workers. *Jaffee v. Redmond*, 518 U.S. at 12–18, 116 S.Ct. 1923. The privilege was not based on the Constitution or rooted in any constitutional right. *United States v. Glass*, 133 F.3d 1356, 1358 (10th Cir.1998). Nor was it subject to a balancing test. *Jaffee v. Redmond*, 518 U.S. at 17–18, 116 S.Ct. 1923; *United States v. Glass*, 133 F.3d at 1358. The Court left the contours or reach of the privilege to be addressed in the future on a case by case basis. *Jaffee v. Redmond*, 518 U.S. at 17, 116 S.Ct. 1923.

Unlike the circumstance at issue in *Jaffee*, this case is a criminal prosecution involving the medical records of a key government witness. The evidentiary benefit of allowing access to such medical records to defense counsel in order to effectively prepare and cross examine Joseph Mazzola is great. *Cf. Jaffee v. Redmond*, 518 U.S. at 11, 116 S.Ct. 1923 (noting that "evidentiary benefit that would result from the denial of the privilege is modest"). Although the societal interest in guarding the confidentiality of communications between a therapist and his or her client is significant, it does not outweigh the need for effective cross examination of this key government witness at the criminal trial. *See generally Jaffee v. Redmond*, 518 U.S. at 9–10, 116 S.Ct. 1923 (question of whether to recognize federal common law privilege under Rule 501 in light of reason and experience is whether privilege " 'promotes sufficiently important interests to outweigh the need for probative evidence' "). Reason and experience caution against recognizing a blanket federal common law privilege for therapist records of an important government witness regarding therapy sessions temporally proximate to the criminal charges.

■ Because a federal common law privilege does not apply, it becomes necessary to address whether Joseph Mazzola has a privacy privilege rooted in the Constitution protecting the medical records at issue. *Cf. United States v. Lowe*, 948 F.Supp. 97, 99 n. 3 (D.Mass.1996) (declining to address constitutional privilege as unnecessary because court found federal common law privilege attached under Rule 501). The right of privacy founded in the Fourteenth Amendment's concept of personal liberty protects the right of an individual such as Joseph Mazzola to avoid disclosing personal and private matters. *See Whalen v. Roe*, 429 U.S. 589, 599–600 & n. 23 & 24, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). At best, however, the Constitution "provides *qualified* protection for medical records." *United States v. Polan*, 970 F.2d 1280, 1285 (3rd Cir.1992) (emphasis added). The individual's right to privacy in avoiding disclosure of medical records as well as the federal policy of protecting the privacy of a patient's medical records, *see United States v. Sutherland*, 143 F.Supp.2d 609, 612 (W.D.Va.2001) (noting that the recent Health Insurance Portability and Accountability Act demonstrated "strong federal policy" of protecting medical records), are therefore balanced against the defendant's interest in examining the medical records of a key government witness and the concomitant right to cross examine that witness. *See United States v. Polan*, 970 F.2d at 1285 ("individual's privacy interest in medical records must be balanced against the legitimate

need of others in obtaining disclosure"); *United States v. Lindstrom*, 698 F.2d 1154, 1166–1167 (11th Cir.1983); *United States v. Sutherland*, 143 F.Supp.2d at 611–612.

As discussed in the September 3, 2002 Order, defendants have a Sixth Amendment right to confront the witnesses testifying against them. (Docket Entry #115, p. 5). "One goal of effective cross-examination is to impeach the credibility of opposing witnesses." *United States v. Lindstrom*, 698 F.2d at 1160.

■ Mental disorders such as an addiction to drugs are highly probative of credibility and may materially effect the accuracy of a witness' testimony.[7] *United States v. Lindstrom*, 698 F.2d at 1160 ("conservative list" of mental defects that "materially affect the accuracy of testimony" includes "drug addiction"). The scope and depth of Joseph Mazzola's drug use during the time period covered by the Indictment, as evidenced by the medical records, may impact his ability to perceive the events in question. *See United States v. Lindstrom*, 698 F.2d at 1164–1166. His drug dependency and use of prescription medication due to various medical problems continued to a significant and dramatic degree after the time period charged in the Indictment. Medication prescribed to Joseph Mazzola, primarily for back pain, sinusitis, gastroesophageal reflux disease and kidney stones, is material to assess the depth, degree and ongoing nature of Joseph Mazzola's drug problem. Severe psychological issues coupled with the magnitude of the continued use of prescription medication after the time period covered by the Indictment

impacts Joseph Mazzola's acuity and ability to testify accurately at trial. Although to a degree cumulative, *see United States v. Polan*, 970 F.2d at 1285 (disclosure of cumulative records provided little useful information), the information nonetheless evidences the depth and ongoing nature of the drug problem. *See United States v. Lindstrom*, 698 F.2d at 1166 ("cumulative evidence of the psychiatric records suggests that the key witness was suffering from an ongoing mental illness which caused her to misperceive and misinterpret the words and actions of others"). Indeed, notes reflect that he experienced increased anxiety surrounding court dates. Such information will assist the jury in evaluating his ability to testify accurately and to perceive and recall events accurately.[8] *See generally United States v. Butt*, 955 F.2d at 82 (evidence "about prior condition of mental instability that 'provide[s] some significant help to the jury'" in evaluating "'witness's ability to perceive or to recall events or to testify accurately'" is relevant).

■ Likewise, information in the medical records about the perceived abuse from his father, a co-defendant, as well as from familial co-defendants and, to a lesser extent, other family members,[9] will assist the jury in evaluating Joseph Mazzola's credibility and motivations for testifying. Defendant Stephen J. Mazzola also has an interest in obtaining information in the medical records relative to Joseph Mazzola's financial difficulties in order to support the defense that Joseph Mazzola was embezzling the underreported funds. References in the medical records to Joseph Mazzola's fragility, mental

---

7. Local Rule 116.2(B)(2)(g) mandates the production of "information known to the government of any mental or physical impairment of any [key government witness], that may cast doubt on the ability of that witness to testify accurately or truthfully at trial as to any relevant event." Likewise, the First Circuit in *United States v. Butt*, 955 F.2d 77, 82 (1st Cir.1992) recognizes that, "Evidence about a prior condition of mental instability that 'provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately' is relevant."

8. This court expresses no opinion on the admissibility of such information at trial which is solely an issue for the trial judge.

9. In the course of reviewing the medical records in camera, this court balanced *inter alia* the public interests impacted by disclosure, the interests of defendant Stephen J. Mazzola in defending himself and cross examining an important government witness, an interest that is admittedly less for information relative to non-defendant family members and during the time period not covered by the Indictment, and the privacy interests of Joseph Mazzola. Although there is a modicum of privacy in the medical records, the interests of defendant Stephen J. Mazzola often outweighed such concerns during the in camera review.

instability and anxiety are material to his perception of events during the time period charged in the Indictment and his ability to recall and testify to such events at trial. Finally, limiting the disclosure to counsel subject to a protective order [10] constitutes less of an intrusion upon Joseph Mazzola's right to privacy than a broader, more public disclosure. *See United States v. District of Columbia,* 44 F.Supp.2d 53, 61 (D.D.C.1999) (Supreme Court in *Whalen* recognizes "that non-public disclosures of medical records constitute less of an intrusion upon an individual's right to privacy than do public disclosures").

Defendant Stephen Mazzola is entitled to the disclosure of all exculpatory and material information in the medical records in the government's possession. Having conducted an in camera review in light of the above framework, the government is ordered to make the following, additional disclosures: [11]

## I. *HMI Fitchburg (Habit Management)*

The government is directed to disclose in their entirety the progress notes dated May 10, 2002; April 29, 2002; April 22, 2002; April 12, 2002; March 29, 2002; February 4, 2002; January 25, 2002; May 22, 2000; April 10, 2000; April 7, 2000; December 27, 1999; November 15, 1999; September 27, 1999; August 23, 1999; April 5, 1999; and October 26, 1998.

The government is further directed to disclose:

(1) the progress notes dated March 8, 2002, in redacted form omitting the first two sentences in the second paragraph designated "D";

(2) the progress notes dated May 26, 2000, in redacted form omitting the first four sentences in the second paragraph designated "D";

(3) the progress notes dated February 7, 2000, in redacted form to include only the first two sentences in the second paragraph designated "D";

(4) the progress notes dated November 8, 1999, in redacted form omitting the first three sentences in the second paragraph designated "D";

(5) the progress notes dated August 30, 1999, in redacted form omitting the first three sentences in the second paragraph designated "D" and the first line of the first paragraph designated "P";

(6) the progress notes dated August 2, 1999, in redacted form to include only the last sentence in the second paragraph designated "D";

(7) the progress notes dated June 14, 1999, in redacted form to include only the last sentence in the second paragraph designated "D"; and

(8) the progress notes dated December 21, 1998, in redacted form omitting the last three sentences in the second paragraph designated "D".

## II. *Parkland Medical Center, North Central Human Services and Lahey Clinic*

### A. *North Central Human Services*

The government is instructed to disclose in their entirety:

(1) the North Central Human Services ("NCHS") psychiatric evaluation dated October 19, 2000;

(2) the NCHS psychiatric evaluation dated January 18, 2001;

(3) the NCHS transfer summary dated March 14, 2001;

(4) the NCHS 90 day treatment plan dated December 15, 2000;

(5) the NCHS 90 day treatment plan dated September 15, 2000;

---

**10.** Counsel for defendant Stephen J. Mazzola and the government are directed to confer and attempt to arrive at a mutually agreeable protective order regarding the disclosure. The government need not make the required disclosure until a protective order is in place.

**11.** Although a number of the disclosures are redacted or direct the government "only" to disclose certain notations, the government is further ordered to include enough information in the redacted copies to identify the patient, the date of treatment and, if it exists, the diagnosis or patient complaint. A number of the references, particularly those in the telephone memoranda, do not include a diagnosis or complaint.

(6) the NCHS 90 day treatment plan dated June 15, 2000;

(7) the NCHS 90 day treatment plan dated March 15, 2000;

(8) the NCHS 90 day treatment plan dated December 15, 1999;

(9) the NCHS 90 day treatment plan dated September 15, 1999; and

(10) the NCHS assessment dated September 15, 1999.

The government is further directed to disclose the NCHS psychiatric evaluation dated September 28, 2000, in redacted form omitting the eighth paragraph designated "History + Mental Status Evaluation."

### B. *The Lahey Clinic*

The government is directed to disclose the Lahey Clinic notes regarding prescription medications including:

(1) the telephone memorandum dated August 1, 1994;

(2) the triage note dated August 4, 1994, redacted to include only the box designated "Current Meds";

(3) the Lahey Clinic note with the date of arrival of November 2, 1994;

(4) the triage note dated November 2, 1994, redacted to include only the box designated "Current Meds," and the typed emergency medicine note dated November 2, 1994, redacted to include only the sixth paragraph and the fourth and fifth lines on page two of the progress notes relative thereto;

(5) the progress notes dated December 12, 1994;

(6) the telephone memorandum dated December 13, 1994;

(7) the triage note dated December 31, 1994, redacted to include only the box designated "Current Meds";

(8) the Lahey Clinic note with the date of arrival of January 26, 1995, redacted to include the box designated "medication" and the medication prescribed on the fourth from the bottom line of the first page of the note;

(9) the triage note dated January 26, 1995, redacted to include only the box designated "Current Meds";

(10) the ambulatory order form dated February 15, 1995;

(11) the ambulatory order form dated February 17, 1995;

(12) the progress notes dated March 10, 1995, redacted to include only the tenth and eleventh lines after the words "MEDS";

(13) the triage note dated June 7, 1995, redacted to include only the box designated "Current Meds" and the seventh and eighth lines of the nurse's notes;

(14) the triage note dated August 2, 1995, redacted to include only the box designated "Current Meds";

(15) the Lahey Clinic note with the date of arrival of September 5, 1995, redacted to include only the boxes designated "meds at home" and "patient instructions";

(16) the progress notes dated December 4, 1995;

(17) the Lahey Clinic note with the date of arrival of December 28, 1995, redacted to include only the boxes designated "meds at home" and "patient instructions";

(18) the progress notes date stamped January 15, 1996;

(19) the progress notes date stamped February 19, 1996;

(20) the Lahey Clinic note with the date of arrival of April 9, 1996, redacted to include only the boxes designated "nurse's note," "meds at home" and "patient instructions";

(21) the telephone memorandum dated April 10, 1996;

(22) the progress notes date stamped April 19, 1996, redacted to include only line eight;

(23) the telephone memorandum dated May 9, 1996;

(24) the progress notes date stamped May 21, 1996, redacted to include only lines ten and 11;

(25) the emergency services note dated June 2, 1996, redacted to include the box designated "current meds";

(26) the telephone memorandum dated June 3, 1996;

(27) the telephone memorandum dated July 1, 1996;

(28) the progress notes date stamped August 1, 1996, redacted to include only the second and third to the last lines;

(29) the progress notes date stamped August 26, 1996, redacted to include lines eight, nine, 21, 22 and 23;

(30) the Lahey Clinic note with the date of arrival of September 9, 1996, redacted to include only the boxes designated "medication" and "patient instructions";

(31) the Lahey Clinic note with the date of arrival of September 9, 1996, redacted to include only the boxes designated "medication" and "patient instructions";

(32) the consultation form dated September 10, 1996, redacted to include medications noted therein;

(33) the ambulatory order form dated September 13, 1996, redacted to include the box designated "diagnostic tests";

(34) the telephone memorandum dated October 14, 1996;

(35) the Lahey Clinic note with the date of arrival of November 9, 1996, redacted to include only the boxes designated "meds at home" and "patient instructions";

(36) the telephone memorandum dated December 4, 1996;

(37) the emergency department patient flow sheet dated January 15, 1996, redacted to include the box designated "current meds";

(38) the telephone memorandum dated November 12, 1996;

(39) the telephone memorandum dated January 15, 1997, redacted to include the first two lines of the "M.D. Notes";

(40) the telephone memorandum dated January 7, 1997;

(41) the telephone memorandum dated December 11, 1996, redacted to include only the third and fourth lines of the "M.D. Notes";

(42) the telephone memorandum dated January 14, 1997;

(43) the Lahey Clinic note with the date of arrival of September 22, 1997;

(44) the emergency department orders dated September 22, 1997;

(45) the typed emergency medicine note dated September 22, 1997, redacted to include the last sentence;

(46) the emergency department orders dated September 26, 1997, at 13:46 p.m.;

(47) the Lahey Clinic note with the date of arrival of September 26, 1997, redacted to include only the boxes designated "patient instructions";

(48) the emergency department patient flow sheet dated September 26, 1997, redacted to include the box designated "current meds";

(49) the telephone memorandum dated January 17, 1997;

(50) the typed emergency note dated September 30, 1997, redacted to include the line designated "Current Medications";

(51) the typed emergency note dated October 22, 1997, redacted to include the line designated "Medications";

(52) the emergency department patient flow sheet dated October 22, 1997, redacted to include the box designated "current meds";

(53) the emergency department orders dated October 22, 1997;

(54) the telephone memorandum dated October 26, 1997;

(55) the emergency department patient flow sheet dated October 26, 1997, redacted to include the box designated "current meds";

(56) the progress notes dated October 30, 1997, redacted to include only the prescribed medication;

(57) the telephone memoranda dated October 27, October 30, November 28 and December 8, 1997, redacted to include the notations regarding Percocet;

(58) the progress notes date stamped December 10, 1997, redacted to include the last

four lines with notations regarding medications;

(59) the telephone memorandum dated December 31, 1997;

(60) the Lahey Clinic note with the date of arrival of December 25, 1997, redacted to include the box designated "patient instructions";

(61) the emergency department patient flow sheet dated December 25, 1997, redacted to include the boxes designated "current meds" and the "medications given in ED";

(62) the typed emergency note dated December 25, 1997, redacted to include the second sentence in the final paragraph;

(63) the telephone memorandum dated December 26, 1997;

(64) the ambulatory order form dated April 21, 1998;

(65) the progress notes date stamped April 21, 1998, redacted to include only lines 16 to 18;

(66) the progress notes date stamped April 27, 1998, redacted to include the medications;

(67) the ambulatory surgery report dated October 3, 1997, redacted to include the line above the physician's signature;

(68) the paragraph designated by the number 12 in the physician's orders dated October 3, 1997;

(69) the discharge report dated July 20, 1994, redacted to include the box designated "discharge medications and special instructions";

(70) the typed discharge summary for the July 20, 1994 discharge, redacted to include only the discharge medications;

(71) the pre-anesthetic assessment dated July 14, 1994, redacted to include only the box designated "current medications";

(72) the post anesthesia care unit flow sheets dated July 14 and 15, 1994, redacted to include the prescribed medications;

(73) the physician orders dated July 14 to 19, 1994, redacted to include the medications;

(74) the routine medication sheets for the dates of July 14 to 20, 1997;

(75) the ambulatory surgery report dated August 21, 1995, redacted to include the list of medications;

(76) the physician orders dated August 21, 1995, redacted to include the medications;

(77) the patient care instructions dated October 14, 1997, redacted to include the box designated "medications";

(78) the typed operative record dated October 14, 1997, redacted to include only the last sentence on the second page;

(79) the pre-procedure assessment dated October 14, 1997, redacted to include the box designated "current medications";

(80) the PRN medication sheet dated October 14, 1997;

(81) the typed discharge summary for the September 28, 1997 discharge redacted to include the last sentence on the second page and the line regarding "medications on admission" on the first page;

(82) the emergency department patient flow sheet dated September 27, 1997, redacted to include the box designated "medications given in ED" and "current medications";

(83) the emergency department treatment orders dated September 27, 1997;

(84) the physician orders dated September 27, 1997, redacted to include the list of medications;

(85) the routine medication sheet and the PRN medication sheet dated September 27, 1997;

(86) the progress notes dated September 27, 1997, redacted to include the entire exchange under the "Pain" paragraph;

(87) the telephone memorandum dated February 5, 1995;

(88) the progress notes date stamped February 15, 1995;

(89) the progress notes date stamped January 31, 1995, redacted to include the information regarding his sister, brother and medications;

(90) the telephone memoranda dated "12/21" and January 9, 1995; and

(91) the progress notes dated January 5, 1998, redacted to include the medications.

III. *Melrose–Wakefield Hospital, Winchester Hospital, Mystic Valley Urological Associates, Inc. and Meeting House Family Practice*

### A. *Melrose–Wakefield Hospital*

The government is directed to disclose pages one, three and five of the intake biopsychosocial assessment dated December 28, 1997.

### B. *Winchester Hospital*

The government is directed to disclose:

(1) the typed consultation notes dated March 25 and 26, 1998, redacted to include only the paragraph regarding medications;

(2) the patient progress notes dated March 26 and 17, 1998, redacted to include the medications;

(3) the PRN medications sheet and the daily medication sheet .dated March 26, 1998;

(4) the patient discharge instructions sheet dated January 20, 1997, redacted to include the medication schedule;

(5) the PRN medications sheet dated January 19, 1997;

(6) the triage sheet dated February 8, 1998;

(7) the emergency department notes for the dates of service of February 7, 1998 and January 15, 1997, redacted to include the boxes designated "discharge meds"; and

(8) the emergency department note for the date of service of December 27, 1997, redacted to include the box designated "discharge meds."

### C. *Mystic Valley Urological Associates, Inc.*

The government is directed to disclose:

(1) the undated prescription with the hand written script "not working";

(2) the telephone message dated July 21, 1997; and

(3) the notebook entry dated May 7, 1997.

### D. *Meeting House Family Practice*

The government is directed to disclose:

(1) the progress notes dated August 2 and 3, 1999, redacted to include the information regarding medications;

(2) the progress notes dated July 29, 1999, redacted to include the information regarding medications;

(3) the progress notes dated January 1, 1998, redacted to include the information regarding medications;

(4) the progress notes dated April 12, 2002, redacted to include the information regarding medications;

(5) the telephone messages dated April 26, March 26, February 18 and January 15, 2002, redacted to include the information regarding medications;

(6) the December 10 and 31, 2001 telephone messages redacted to include the information regarding medications;

(7) the November 28, 2001, progress notes redacted to include the information regarding medications;

(8) the November 6, 2001 and October 30, 2001 telephone messages;

(9) the September 25, 2001 progress notes redacted to include the information regarding medications;

(10) the September 10, August 7 and June 22, 2001 telephone messages;

(11) the August 22 and July 24, 2001 progress notes redacted to include the information regarding medications;

(12) the July 5 and 12, 2001 telephone messages redacted to include the information regarding medications;

(13) the May 24 and 25 and June 9 and 13, 2001 telephone messages redacted to include the information regarding medications;

(14) the last line above the signature of the May 25, 2001 progress notes;

(15) the April 24, 2001 telephone message;

(16) the May 2 and April 5, 2001 progress notes redacted to reflect the medications;

(17) the March 26, 2001 telephone message redacted to include the information regarding medications;

(18) the page beginning with the March 15, 2001 progress notes redacted to include only the information regarding medications;

(19) the progress notes dated March 7 and February 7 and 21, 2001, redacted to include the information regarding medications;

(20) the January 8, 13, 26 and 30, 2001 telephone messages;

(21) the progress notes dated January 19 and 22, 2001, redacted to include the information regarding medications;

(22) the January 18, 2001 telephone message redacted to include the information regarding medications;

(23) the December 29, November 29, and October 2 and 30, 2000 telephone messages;

(24) the undated progress notes on the page containing the August 29, 2000 telephone message redacted to include the information regarding medications;

(25) the July 8 and 14, June 12 and 13, and May 16, 2000 telephone messages;

(26) the progress notes dated July 11 and 14, 2000, redacted to include the information regarding medications;

(27) the July 5 and April 17, 2000 telephone messages redacted to include the information regarding medications;

(28) the February 28, 2000 telephone message and progress notes immediately thereafter redacted to include the information regarding medications;

(29) the January 4, 2000 telephone message;

(30) the February 2, 2000 telephone message redacted to include the information regarding medication;

(31) the last four lines of the progress notes dated February 22, 2000;

(32) the progress notes dated November 17, 1999 and March 6 and April 3, 2000,

redacted to include the information regarding medications;

(33) the April 8, 2000 telephone message redacted to include the information regarding medication;

(34) the March 7, 13 and 20, 2000 telephone messages;

(35) the two October 20, 1999 telephone messages;

(36) the progress notes dated October 13, 1999;

(37) the September 22 and October 7, 1999 telephone messages;

(38) the September 27, 1999 telephone message redacted to include the information regarding medication;

(39) the page containing the progress notes dated September 10, 1999, redacted to include the information regarding medications;

(40) the two August 9, 1999 telephone messages; and

(41) the progress notes dated August 11, 1999.

Addressing the adequacy of the government's redactions with respect to the disputed documents vis-a-vis the motion to determine compliance (Docket Entry # 123), the government is directed to disclose R–1, R–4,[12] R–5, R–6,[13] R–10, R–11, R–13, R–15, R–16, R–17, R–20 and R–21. The government is also instructed to disclose: (1) the redacted date, patient name and doctor in R–7; (2) the first, fourth, seventh, eighth and ninth lines in R–8; (3) R–12 except for the second line in section number one; (4) R–14 except for the second, third and fourth lines in section number one; and (5) R–18 except for the three lines immediately above the first disclosed line.

## CONCLUSION

The motion for reconsideration (Docket Entry # 128) is **DENIED** to the extent it

---

12. The government's disclosure relative to the "peer's suicide" waives the privacy interest regarding the same subject matter in the redacted lines.

13. The government's production of the same subject matter in R–8 waives the privacy interest relative to the subject matter of the first redacted line in R–6.

seeks to provide defense counsel for defendant Stephen J. Mazzola [14] complete access to the medical records and **ALLOWED** to the extent it seeks to broaden the September 3, 2002 Order to give counsel access to the above records which the government is directed to disclose forthwith.[15] The government is ordered to provide defense counsel access to all exculpatory material and impeachment evidence in the medical records which shall be docketed and placed under seal. The motion to determine compliance (Docket Entry # 123) is **ALLOWED** inasmuch as the government was not in compliance with this court's September 3, 2002 Order and the government must disclose the aforementioned additional records which include the records relating to Joseph Mazzola's relationship with his sibling co-defendants. The parties are directed to appear for a final status conference on August 27, 2003, at 2:30 p.m.

---

**14.** See footnote number six.

**15.** See footnote number ten.