UNITED STATES ARMY COURT OF CRIMINAL APPEALS

 Before
 CONN, HOFFMAN and GIFFORD
 Appellate Military Judges

 UNITED STATES, Appellee
 v.
 Master Sergeant JOHN E. HATLEY
 United States Army, Appellant

 ARMY 20090329

 7th Army Joint Multi-National Training Command
 Jeffery R. Nance, Military Judge
 Lieutenant Colonel William R. Martin, Staff Judge Advocate (pretrial)
 Lieutenant Colonel Francisco A. Vila, Staff Judge Advocate (post-trial)

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA (argued); Captain Pamela Perillo, JA (on
brief).

For Appellee: Captain Christopher B. Witwer, JA (argued); Colonel Michael E. Mulligan, JA; Major
Christopher B. Burgess, JA; Major Lajohnne A White, JA; Captain Christopher B. Witwer, JA (on
brief).

 30 June 2011

 ----------------------------------
 MEMORANDUM OPINION
 ----------------------------------

 This opinion is issued as an unpublished opinion and, as such, does not serve as precedent

CONN, Senior Judge:

 An enlisted panel sitting as a general court-martial convicted appellant, contrary to his
pleas, of conspiracy to commit premeditated murder and premeditated murder, in violation of Articles
81 and 118, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 881 and 918.
Appellant was acquitted of an additional offense of premeditated murder and obstruction of justice.

 The court sentenced appellant to reduction to the grade of E-1; forfeiture of all pay and
allowances; confinement for life (with eligibility for parole); and a dishonorable discharge. The
convening authority reduced the sentence to confinement for forty years and, with the exception of
forfeitures, approved the remainder of the adjudged sentence. The case is before us for review
under Article 66, UCMJ.[1]

 Appellant asserts three assignments of error. First, he alleges he was denied a speedy trial.
Second, he alleges he was denied his right to confrontation when precluded from cross-examining a
witness on the witness’ potential mandatory life sentence. Finally, he alleges he did not receive
appropriate relief for unlawful pretrial punishment. These assignments of error merit discussion
but not relief.

 BACKGROUND

 The Incident

 In March of 2007 appellant was the leader of a conspiracy involving the premeditated murder of
four military detainees in Baghdad, Iraq. Appellant was the First Sergeant (the most senior non-
commissioned officer (NCO)) of his infantry company. The incident began when appellant accompanied
a platoon of a dozen or more of his subordinate soldiers in a multi-vehicle patrol. The patrol
operated in a sector where appellant’s unit had been repeatedly attacked. These attacks resulted in
numerous casualties, including the deaths of two of the unit’s noncommissioned officers, SGT S and
SGT G, within a few weeks of the incident.

 During this time, the patrol came under fire, which was eventually traced to several men who
fled to a nearby building. The patrol searched the building and found and detained four adult
males. The search also uncovered a cache of arms and munitions, including a sniper rifle and other
weapons as well as duffel bags of linked ammunition (a type used in automatic weapons). The four
men, along with the weapons cache, were photographed. The detainees were then handcuffed and
blindfolded and placed in the back of a Bradley fighting vehicle to be taken to a detention
operations center (DOC) for processing. Appellant called together several of the NCOs, complaining
the DOC was likely to release the detainees and suggested they should “take care of” them.
Appellant told the NCOs to check with their soldiers to see if anyone “had a problem” with that. He
became exasperated when he found out that one of the NCOs had already radioed a report to the
command out post (COP) that the patrol had taken detainees.

 The patrol first went back to the COP, where appellant briefly went inside. He then called
together the NCOs from the patrol and advised that headquarters “was not tracking” the detainees.
Appellant then directed the patrol to remount and return to the sector. The patrol convoy went to a
canal area, where appellant again gathered his NCOs and asked who was willing to help him “take
care” of the detainees. Two of the NCOs, the platoon sergeant, Sergeant First Class (SFC) Mayo and
Sergeant (SGT) Leahey agreed. Several other NCOs did not agree and returned to their vehicles.
Appellant then had the four handcuffed and blindfolded detainees removed from the Bradley vehicle
and lined up at the edge of the canal. Appellant, SFC Mayo and SGT Leahy then shot each of the
detainees point blank in the back of the head, removed their handcuffs, and pushed their lifeless
bodies into the water. The convoy thereafter returned to the COP. There appellant gathered all of
the soldiers from the patrol and told them, “What was done was done for SGT [S] and SGT [G] . . .
and for all the motherf**kers who think they can shoot us and get away with it. If anyone asks any
questions, direct them to me.”

 Pretrial Conditions Imposed on Appellant and Trial Timeline

 In January 2008, after appellant’s unit returned to their home station in Schweinfurt, Germany,
one of the soldiers reported the murders. On 18 January 2008, appellant’s battalion commander gave
appellant an order to have no contact with the other soldiers in his company until the investigation
was complete. The commander also ordered appellant to remain under the supervision of his command
sergeant major (CSM, the most senior ranking NCO of battalion and higher units) until he was
interviewed by Army criminal investigators the following day and to remain on the installation.
Appellant continued his preparations for reassignment, cleared his family quarters, and placed his
household goods in shipment. However, in February 2008 his orders were revoked and he was assigned
to live in bachelor quarters at a soon-to-close installation in Würzburg, Germany, approximately a
30 minute drive from Schweinfurt. Appellant was denied leave to accompany his wife back to the U.S.
However, his wife returned to live with appellant in Germany a few weeks later. By April, appellant
was again assigned family quarters in Schweinfurt and received his household goods from storage.

 From February to May 2008, appellant’s primary duty was to report daily to his CSM. From
February to April, appellant drove himself from Würzburg to Schweinfurt. Appellant’s CSM sought an
appropriate position for appellant, and in late May or early June 2008, appellant began duties at
the housing office in Schweinfurt, where he worked until his trial in April 2009. During this
timeframe appellant was granted several leaves; however, he was not permitted to travel outside
Germany.

 On 16 September 2008 appellant’s command preferred court-martial charges against appellant. On
8 October 2008 appellant waived his right to an Article 32 pretrial investigation hearing (a
prerequisite to trial by general court-martial). The convening authority referred appellant’s case
to a general court-martial on 5 January 2009. Appellant was arraigned on 11 January 2009, 119 days
after preferral of charges. At arraignment, appellant requested a trial date in early February
2009. Over defense objection, the military judge set trial for 13 April 2009 based on the
Government’s request to complete the trials of multiple co-accuseds, including SFC Mayo and SGT
Leahy, whose trials had not yet concluded. In February 2009, Sergeant Leahy pled not guilty but was
found guilty of premeditated murder and was sentenced, as required by UCMJ art. 118, to a mandatory
sentence of life in prison, with possibility for parole. In March 2009 SFC Mayo pled guilty to
premeditated murder in exchange for a pretrial agreement limiting his confinement to 30 years,
rather than confinement for life otherwise required for conviction of premeditated murder.

 DISCUSSION

 Military Speedy Trial

 In military law, there are statutory, constitutional, and rule-based sources which protect an
individual’s right to a speedy trial. The statute of limitations, set out in UCMJ art. 43, is
clearly inapplicable to appellant’s case because the crime of premeditated murder is expressly
excluded.[2] The Fifth Amendment Due Process Clause precludes prosecution where delays occur based
on egregious or intentional tactical delay and actual prejudice which “appreciably impairs the
ability to mount a defense.” See United States v. Reed, 41 M.J. 449, 451-52 (C.A.A.F. 1995). As a
regulatory matter, Rule for Court-Martial [hereinafter R.C.M.] 707(a) requires that an accused be
brought to trial within 120 days of preferral of charges, imposition of restraint, or entry onto
active duty for purposes of court-martial. An accused is “brought to trial” within the meaning of
the Rule by arraignment. R.C.M. 707(b)(1); R.C.M. 904. If charges are dismissed or the accused is
released from confinement, the clock stops and a new 120-day period begins upon re-preferral of
charges. R.C.M. 707(b)(3)(A)(i) & (B). Appellant conceded in oral argument the Fifth Amendment was
not violated in appellant’s case. We agree.

 Appellant does assert that his statutory right to a speedy trial under UCMJ art. 10 (10 U.S.C.
§ 810), as well as the Sixth Amendment, were violated. The Supreme Court has established a four-
part test for assessing whether a delay amounts to a Sixth Amendment constitutional violation.
Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The so-called Barker test
requires a balancing of the length of the delay, reasons for the delay, whether the appellant
demanded a speedy trial, and any prejudice to the appellant from the delay. These same factors are
applicable to an alleged Article 10 speedy trial violation. See United States v. Birge, 52 M.J.
209, 212 (C.A.A.F. 1999).

 By its terms, UCMJ art. 10 requires that “[w]hen any person subject to this chapter is placed
in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the
specific wrong of which he is accused and to try him or to dismiss the charges and release him.”
Article 10 provides “a more exacting speedy trial” standard than the Sixth Amendment. United States
v. Mizgala, 61 M.J. 122, 124-25 (C.A.A.F. 2005). Logically, a person under arrest or confinement
pending charges suffers greater potential prejudice by delay. The standard under Article 10 for
assessing the Government's actions “is not constant motion, but reasonable diligence in bringing the
charges to trial.” Id. at 127 (citation and quotation marks omitted).

 In conducting our review, we consider the legal question of whether an accused received a
speedy trial de novo. United States v. Doty, 51 M.J. 464, 465 (C.A.A.F. 1999). We give
“substantial deference” to the trial judge’s findings of fact, which “will be reversed only if they
are clearly erroneous.” Mizgala, 61 M.J. at 127.

 Article 10

 In the context of military courts-martial, the UCMJ art. 10 right to speedy trial is triggered
by “arrest or confinement.” Arrest is “the restraint of a person by oral or written order not
imposed as punishment, directing the person to remain within specified limits; a person in the
status of arrest may not be required to perform full military duties . . .” R.C.M. 304(a)(3).
Confinement is “physical restraint, imposed by order of competent authority, depriving a person of
freedom pending disposition of offenses.” R.C.M. 304(a)(4). Sixth Amendment speedy trial
protections are triggered upon initiation of a court-martial by preferral of charges. United States
v. Grom, 21 M.J. 53 (C.M.A. 1985). Rule for Court-Martial 707 provides a bright-line 120 day rule
for speedy trial, triggered by either initiation of restraint or preferral of charges. R.C.M.
707(a). All three protections evaluate the impact of delay from their triggering event. A
violation of R.C.M. 707 may or may not preclude ultimate trial. Violations of UCMJ art. 10 or the
Sixth Amendment will preclude prosecution. R.C.M. 707 (d)(1).

 Appellant argues he was subject to arrest or confinement, thereby triggering UCMJ art. 10
protections beginning in January 2008, when he was placed under the supervision of CSM Choudri. In
his brief, appellant asserts this was “because he was not allowed to stay on his base or keep his
job; additionally he was required to drive over thirty miles to sign in every day for over 120
days.” On this issue, the military judge made extensive findings of fact, and we find no error in
his findings. Those facts are inconsistent with appellant’s asserted facts and argument.
Specifically, the judge found appellant was under the direct supervision and custody of CSM Choudri
from 18 to 21 January 2008, after which he “was allowed to return to his own lodgings and go about
his business, subject to the verbal and then written no contact order [with other suspects]” issued
by his battalion commander. Appellant continued to prepare for his reassignment to the U.S., and
moved from his quarters. Subsequently, his reassignment was cancelled. For that reason he was
provided quarters in Würzburg for a 90 day period from 1 February to 1 May 2008. While only gym,
library and food facilities were available at the Würzburg post due to its imminent closure,
appellant was allowed to go to and use the post exchange, commissary and other facilities in
Schweinfurt. Within 90 days, appellant was reassigned family quarters in Schweinfurt, and on 1 June
he began working in the Schweinfurt housing office for the nine-month period leading up to his
trial. The judge found that, other than being denied leave to go the U.S. in February 2008, “the
accused was allowed to go anywhere he wanted outside the terms of his conditions on liberty as long
as he received permission from CSM Choudri first,” which the judge noted was “never denied.” This
included leave in Germany.

 The record amply supports the military judge’s findings that the conditions imposed upon
appellant amounted to neither confinement nor restriction which would trigger Article 10. At least
after the two to three day period appellant stayed under CSM Choudri’s direct supervision, the
conditions imposed upon appellant could not credibly be characterized as confinement or arrest.
Contrary to appellant’s assertion, these conditions were far less rigorous than the hourly sign-in
and restriction to a small squadron area found to amount to confinement in United States v. Schilf,
1 M.J. 251 (C.M.A. 1976). At most, the conditions were equivalent to a withdrawal of unmonitored
pass privileges, which is not an arrest for purposes of Article 10. United States v. Walls, 9 M.J.
88, 90 (C.M.A. 1980); see also United States v. Burrell, 13 M.J. 437 (C.M.A. 1982). While appellant
did appear to have limited duties from February to June, the evidence of record makes clear that was
due to the last-minute change to his reassignment, his rank and seniority, and the practical need to
limit his contact with members of his unit during the investigation. CSM Choudri’s testimony during
the motions hearing likewise made it clear the command was diligently searching for suitable duties
for appellant, and was not precluding him from meaningful duties as a term of arrest or confinement.
 We therefore conclude that, because he suffered no confinement or arrest, Article 10 is not
implicated in appellant’s case.

 Rule for Court-Martial 707 Protections

 We also recognize that the Manual for Court-Martial’s 120-day speedy trial protections found in
R.C.M. 707 are triggered by restraint less than confinement or arrest necessary to implicate UCMJ
art. 10. See R.C.M. 707(a)(2). However, under the totality of the circumstances, including
appellant’s ability to drive himself daily between Würzburg and Schweinfurt, and the denial of
virtually no request to go outside the limits imposed on him, we find the conditions at most
amounted to conditions on liberty, imposition of which do not trigger R.C.M. 707’s protections.
United States v. Wagner, 39 M.J. 832, 833 (A.C.M.R. 1994); see also discussion to R.C.M. 304(a),
which notes an “order to report periodically to a specified official” amounts to a condition on
liberty, which does not trigger R.C.M. 707. Rule for Court-Martial 304(a)(1) defines a condition on
liberty as “imposed by orders directing a person to do or refrain from doing specified acts.” It is
apparent from the record the command’s primary concern was limiting contacts among the many
individuals involved. The necessity to limit such pretrial contacts is readily apparent, especially
where the accused is the most senior ranking individual who supervised all of the other actors
involved. Because we find the circumstances did not amount to “restraint” under the rule, R.C.M.
707’s protections were not implicated until preferral of charges, and appellant concedes the 120-day
timeframe of that rule was met by his arraignment on 14 January 2009.

 Sixth Amendment Speedy Trial

 Consequently, we consider delays in appellant’s case under the Sixth Amendment Barker factors
from the time of initiation of court-martial charges. As to the length of delay, charges were
preferred against appellant in September 2008 and he was not ultimately tried until April 2009, a
period of seven months. Beginning in October 2008, appellant repeatedly demanded a speedy trial.
After arraignment, the government requested an additional three-month delay until trial. The length
of these delays and appellant’s insistence on an immediate trial must be balanced against the
reasonableness of the delays and whether appellant was prejudiced by them. The government’s
asserted reasons for further delays were to complete the prosecutions in multiple cases arising from
the murders, which involved as many as eighteen potential immunized witnesses and sixteen co-
accuseds, the three most culpable of whom had not been tried by January of 2009. We disagree with
appellant’s assertion that this was a simple case. The complexity of a case, both in terms of the
necessity for investigation and the number of witnesses involved, is a legitimate basis for delay.
United States v. Hatfield, 44 M.J. 22, 23 (C.A.A.F. 1991). The government also had an interest in
trying appellant, the leader of the conspiracy and its most senior participant, after his
subordinates. Obviously, this was both to avoid potential compromise of other co-conspirators’
convictions,[3] and to strengthen its chance to convict the most culpable member of the conspiracy.
This is a recognized legitimate interest. See Discussion to R.C.M. 906(b)(1); United States v.
Weisbeck, 50 M.J. 461, 464 (C.A.A.F. 1999). Additionally, in setting the trial date, the judge
noted court’s own docket of other cases and the need to litigate anticipated motions in appellant’s
case.
 As to the issue of prejudice, our superior court set out the test for prejudice in the context
of speedy trial, identifying three underlying concerns:

 “(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the
 accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the
 most serious is the last, because the inability of a defendant adequately to prepare his case
 skews the fairness of the entire system.”

 Mizgala, 61 MJ at 129 (quoting Barker v Wingo, 407 U.S. 514, 532 (1972).

 Analyzing those concerns, here we have found that appellant was not subject to arrest or
confinement pending trial. While the record shows appellant was subject to some negative publicity
and his promotion to sergeant major was suspended, it is not clear how a more speedy proceeding
would have alleviated his anxiety or concern, unless it yielded an acquittal. Appellant points to
no specific prejudice to his defense, other than unspecified diminished witness recollection of
specifics. We further note that appellant exploited any resulting inconsistencies and memory lapses
fully in his trial. Finally, the record reflects appellant suffered no lost or unavailable witness
or other impairment in presenting his case resulting from the passage of seven months time between
preferral and ultimate trial.

 Based on the foregoing, we find no speedy trial violation in appellant’s case.

 Pretrial Punishment

 As a separate assignment of error, appellant asserts he was subject to unlawful pretrial
punishment for the conditions his command imposed on him when the investigation of the detainee
murders began in January 2008. In addition to the facts discussed regarding whether appellant was
subject to arrest or confinement, appellant asserts his command prevented him from attending unit
functions, including memorial ceremonies for soldiers killed during operations in Iraq as well as
the unit’s dinner-dance ball. Appellant raised this issue in the form of a motion, but when asked
by the judge whether he wished to present additional evidence other than that already presented on
his speedy trial motion, he declined the opportunity.

 Article 13

 Article 13, UCMJ (10 U.S.C. § 813) states as follows: “No person, while being held for trial,
may be subjected to punishment or penalty other than arrest or confinement upon the charges pending
against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the
circumstances require to insure his presence ....” In brief, UCMJ art. 13 prohibits two things: (1)
punishment before trial, and (2) imposition of arrest or pretrial confinement more rigorous than
necessary to ensure the accused's presence for trial. United States v. Mack, 65 M.J. 108 (C.A.A.F.
2007). Because we found appellant was not subject to arrest or confinement, we will consider only
the first aspect of Article 13, which involves whether the conditions imposed on appellant involved
a purpose or intent to punish. The issue of an intent to punish is evalutated considering the
purpose served by any conditions imposed and whether such purposes are “reasonably related to a
legitimate governmental objective.” Bell v. Wolfish, 441 U.S. 520, 539 (1979); United States v.
McCarthy, 47 M.J. 162, 165 (C.A.A.F. 1997).

 Appellant has the burden of establishing his entitlement to relief under UCMJ Art. 13. United
States v. Mosby, 56 M.J. 309, 310 (C.A.A.F. 2002). We defer to the military judge's findings of
fact unless they are clearly erroneous, but apply the law to the facts de novo. Id.

 In the limited litigation of this issue, defense counsel alleged Article 13 was violated
during the period of CSM Choudri’s supervision. The initial supervision of appellant by CSM Choudri
until his investigative interview served a clear non-punitive purpose to avoid potential collusion
among witnesses or other impact on the investigation. The lack of punitive intent was clear; this
was evident when, after one day, CSM Choudri allowed appellant to stay under the supervision of a
friend and fellow first sergeant, with whom appellant felt more comfortable. Considering the facts
of appellant’s case, we find the follow-on “no contact” order pertaining to other members of the
unit under investigation does not reflect an intent to punish. The legitimate government objective
is apparent: to prevent potential influence of witnesses and likewise protect the appellant from
accusations of witness tampering.

 When the military judge later questioned appellant about potential bases for UCMJ Art. 13
violations, appellant mentioned the daily reporting requirement to CSM Choudri and the requirement
to have his approval before going “anywhere.” However, appellant also stated that, other than being
denied leave outside of Germany, his freedom of movement had not been otherwise restricted.
Significantly, appellant indicated he had been subject to no other forms of restraint other than
those already explored in his speedy trial litigation.

 In ruling there was no UCMJ Art. 13 violation, the military judge referred to his findings on
the speedy trial motion. Again, we do not find those facts in any way erroneous or unsupported by
the record. In light of this, we do not find appellant carried the burden of demonstrating that the
conditions imposed on him constituted pretrial punishment.

 Limits on Cross-Examination

 The final issue appellant raises relates to limits the military judge imposed on cross-
examination of the accomplice and co-conspirator, SFC Mayo. In panel selection, the military judge
prohibited appellant’s defense counsel from posing voir dire questions to the court-martial panel
members on their views regarding the mandatory punishment of life in prison for premeditated murder.
 The judge based his ruling on relevance (neither support for, nor opposition to a mandatory
punishment would be a basis for challenge by the defense) and the potential for jury nullification
(seeking to obtain a verdict influenced by potential sentence rather than the evidence of the case).

 At trial, SGT Leahy first testified against the accused. The defense did not seek to ask
questions regarding the mandatory nature of the life sentence SGT Leahy received at this trial or
that sentence’s impact on his testimony. However, when SFC Mayo testified, the following exchange
occurred:

 Civilian Defense Counsel [CDC]: You made a deal with the government to testify against
 Master Sergeant Hatley, didn’t you?

 Mayo: Yes, sir.

 CDC: That deal meant that you avoided a life sentence for premeditated murder, correct?

 Mayo: Yes, sir.

 CDC: And you knew that the mandatory minimum for premeditated-

 TC: Objection, Your Honor.

 MJ: That’s sustained. Sustained.

 MJ: Mr. Court, if you try that again-well, let me just say, you better not try that
 again. I’ve ruled more than one time on this issue, okay? I have ruled more than one time on
 this issue. You will not sneak this information into the panel through backdoor means. . . .

 CDC: You said that you made a deal with the government to testify against Master
 Sergeant Hatley, correct?

 Mayo: Yes, sir.

 CDC: And, at your trial a couple of weeks ago, you pled guilty and said you were guilty
 of those offenses, correct?

 Mayo: Yes, sir.

 CDC: And you said basically what you said today, correct.
 Mayo: Yes, sir.

 CDC: And it’s your belief that, if you don’t say that today, you lose your deal,
 correct?

 Mayo: Yes, sir.

 The Right of Confrontation

 “[T]he exposure of a witness' motivation in testifying is a proper and important function of
the constitutionally protected right of cross-examination.” Davis v. Alaska, 415 U.S. 308, 316-17
(1974). Through cross-examination, an accused can “expose to the jury the facts from which jurors
could appropriately draw inferences relating to the reliability of the witness.” Id. Limiting an
accused's presentation of bias evidence may violate the Sixth Amendment right to confront witnesses.
 The standard to judge whether confronation has been violated is whether “[a] reasonable jury might
have received a significantly different impression of [the witness'] credibility had [defense
counsel] been permitted to pursue his proposed line of cross-examination.” Delaware v. Van Arsdall,
475 U.S. 673, 680 (1986). A military judge's decision to limit cross-examination as to the
sentencing details of a prosecution witness' plea agreement is reviewed for abuse of discretion.
United States v. James, 61 M.J. 132, 136 (C.A.A.F. 2005).

 The right of confrontation is not without limits. The accused's confrontation right does not
entitle counsel to cross-examine a witness to such an extent as would “‘hammer th[e] point home to
the jury.’ ” Id. at 135 (quoting United States v. Nelson, 39 F.3d 705, 708 (7th Cir. 1994)).
Whether sufficient cross-examination has been permitted depends on whether the witness' motivation
for testifying has already been exposed and “further inquiry ... would [be] marginally relevant at
best and potentially misleading.” United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007)
(holding cross-examination of a co-conspirator about his pretrial agreement sufficient even though
the military judge refused to permit questions related to the term setting a maximum punishment).

 In James, our superior court reiterated its adherence to the Van Arsdall standard to evaluate a
trial judge's limitation of inquiry into potential bias on cross-examination:

 [T]he exposure of a witness' motivation in testifying is a proper and important function of the
 constitutionally protected right of cross-examination. It does not follow, of course, that the
 Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on
 defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary,
 trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose
 reasonable limits on such cross-examination based on concerns about, among other things,
 harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is
 repetitive or only marginally relevant.

Id. at 134-35 (citing Van Arsdall, 475 U.S. at 678-679 (citation and quotation marks omitted). The
military judge's discretion exists only if “‘there has been permitted as a matter of right
sufficient cross-examination.’ ” United States v. Jones, 49 M.J. 85, 88 (1986) (quoting United
States v. Lindstrom, 698 F.2d 1154, 1160 (11th Cir. 1983)).

 Reduced to its essence, appellant’s assignment of error asks whether Sixth Amendment
confrontation rights are violated if counsel is only permitted to ask the impact of a life sentence
versus a mandatory life sentence on a witness’ testimony. In the context of appellant’s case, we
conclude that additional question would not have yielded a significantly different impression of SFC
Mayo’s testimony. Through cross-examination appellant’s defense counsel was able to establish not
only that SFC Mayo was convicted of an offense which carried a life sentence, but also that if he
did not testify consistently with his pretrial agreement, SFC Mayo jeopardized the opportunity to
avoid that potential life sentence. The cross-examination made clear both the positive and negative
motivations which might have influenced his testimony regarding appellant’s role in the murder of
the four detainees. Moreover, the sentences of both SFC Mayo and SGT Leahy were “mandatory” only in
the sense that there was a limit on the court-martial’s discretion in sentencing; it did not bind
the convening authority to approve such a punishment. See Article 60(c)(2), UCMJ. In fact, none of
the individuals convicted of killing the detainees in this case—including appellant—actually
received an approved life sentence.

 Further, we examine the record for an abuse of discretion by the military judge. The
discussion and ruling on introducing the issue of mandatory punishments earlier in appellant’s
proceedings make it clear the military judge was not acting arbitrarily in denying appellant’s
counsel an opportunity to “hammer home” SFC Mayo’s potential bias and motive to fabricate by
highlighting the mandatory sentence for premeditated murder. He was in fact responding to a
legitimate concern regarding an improper premature focus on a potential sentence when adjudicating
guilt or innocence on the merits. We find the “mandatory” nature of the life sentence SFC Mayo was
subject to is precisely the kind of marginally relevant information which reasonably may be excluded
in the exercise of discretion. James, 61 M.J. at 134-35.

 Finally, even if appellant’s confrontation rights were abridged by preventing inquiry into the
“mandatory” nature of his sentence, the findings may be approved if the denial was harmless beyond a
reasonable doubt. United State v. Williams, 40 M.J. 216, 218 (C.M.A. 1994). Factors to consider
include: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the
testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the
testimony of the witness on material points; (4) the extent of cross-examination otherwise
permitted; and (5) the overall strength of the prosecution's case. Id., citing Van Arsdell, 475
U.S. at 684.

 In appellant’s case, while SFC Mayo’s testimony was important, it was in fact cumulative in
material aspects with evidence offered by multiple other witnesses. That included SGT Leahy, who had
no pretrial agreement or limit on his sentence at the time of his testimony, a matter on which SFC
Mayo was thoroughly cross-examined. In fact, there was no evidence to suggest that appellant did
not instigate the conspiracy or carry out its intent by orchestrating and participating in the
premeditated killing of the detainees. Having examined the full record, we are confident beyond a
reasonable doubt that even if SFC Mayo had been confronted with the additional fact that, in the
absence of his pretrial agreement, his life sentence was “mandatory,” it would have had no effect on
the finding that appellant committed premeditated murder.

 DECISION

 We have considered the remaining assignments of error, including the error personally asserted
by appellant pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982), and find them to be
without merit. The findings of guilty and sentence are AFFIRMED.

 Judge HOFFMAN and Judge GIFFORD concur.

 FOR THE COURT:

 JOANNE P. TETREAULT ELDRIDGE
 Deputy Clerk of Court
-----------------------
[1] We heard oral argument in this case at Howard University Law School, Washington, D. C. on 15
February 2011.
[2] Generally, UCMJ Art. 43 imposes a 5 year statute of limitation from the commission of an
offense, except for murder, rape, certain absence offenses during time of war, and certain specified
child abuse offenses.
[3] Kastigar v. United States, 406 U.S. 441 (1972).